Good morning. May it please the court, my name is Bill Kirshner. I'm representing appellant Orencio Ruelas in this appeal. And aside from my aspirational minute and a half I'd like to reserve for rebuttal, I am also going to try the feat of discussing two issues in this oral argument. And the reason I think that that can be done is because on one of them the government has conceded error. And that is the issue of whether this case should be remanded for a resentencing. They've agreed that it should. And they're they have conceded that but they've chipped away a little bit of it and they want to retain the what is it the purity as opposed to the. Right so they want an open record but only as as it pertains to the weight of. And you want it and you want an open record. We want it to be. If we're going to talk about the drugs let's just talk about them. And that it's that it's too it's too integral to do that. That and I am going to ask them when they come up because I've been a trial judge. And so when you go back and you do something and you look at a remand and then you have to figure out what you can do. If you're talking about the same drugs and you're analyzing the whole thing it would get kind of complicated and say well no this is off limits. This is on limits. And so. Yes. That's your argument that just don't talk about it. That's part of it and also the fact that the precedent supports it. The standard procedure for this court and it says so in many cases I just filed a 28 J letter last week with a new case that also stands for the same proposition. Which is that it should be remanded on an entirely open record. So unless there are any further questions on that issue. The only other thing I would say is if the court were inclined to close any part of it then it should close all of it. But it unless the court is inclined to do that I would ask it it be on an entirely open record. The main issue that I would like to discuss here is the inappropriate admission of my client's prior arrest in Los Angeles two years preceding this time. We. Doesn't 404 be a rule of admission not a rule of admission to make it? Yes it is. However you have to weigh the probative value versus the the unfair prejudicial effect. And can we substitute our judgment on how that's weighed? Well you can look at it for an abuse of discretion. And I believe that that's clear here for a couple of reasons. First of all just the the probative value is extremely small in this case because what the government is saying that this was probative of is the defendant's knowledge of obscure drugs and money. That's not too obscure right? I mean those two things seem to go together. Certainly but I think it's not rocket science to middle a deal between two different parties. And the the thing that they probative of is that the defendant wanted to keep the drugs away from the money. That is not really tied to the Los Angeles arrest. It doesn't make any sense from the Los Angeles arrest. There were probably no drugs at all in the Los Angeles case. In the Los Angeles case the client was only arrested. He was not convicted. His name never came up during the wiretaps. There were two other men who left the room. So the the evidence from Los Angeles case is extremely minimal. So you've got a very tiny bit of probative value here as compared to the overwhelming unfair prejudice of the the danger that this will be used as character evidence by the jury. And it sort of allowed the government to get out of... But he contested what your client contested knowledge right? No that was not... He contested an element of the crime. So I mean the government proffered the evidence because they said it showed that Reales had gained specialized knowledge from this 2010 arrest that money and drugs should not be in the same place which was probative of his knowledge of his involvement in the charge conspiracy. So he was contesting something there. Right and I think the best way to contesting was that the evidence from the government was insufficient because the witnesses that they had were, for lack of a better word, pretty terrible people. They were a multiple murderer, an alcoholic, they were all drug dealers. The client contested he was unaware of the conspiracy. Is that what he argued? Yes, that he wasn't part of the conspiracy at all. Not that he didn't know how to do drug deals or how to that he learned any of that from the Los Angeles case. You know you've got to remember that the money in that case was under a nightstand. So we don't even know that he knew it was there. Maybe he did, maybe he didn't. But the money was $75,000. Yes that's correct. But we all keep $75,000 at hand don't we? You never know what expenses you might have judge. Right. But I guess... I like a big lunch. I guess the we don't know that he even knew it was there. It wasn't necessarily visible or at least there's no evidence that it was. So there's no way that you can... there's no nexus between the two to say well I use this knowledge that I got in Los Angeles in this case. And I think that's where we reach the abuse of discretion in this case. Because you've got the statement by the judge that she said she understood that Mr. Ruelas was talking to his co-defendants prior to this arrest about lessons learned and how he would behave differently going forward. Well that's just not anywhere in the record. It's not in the government's pleadings. It certainly wasn't in the government's proof at trial. And so that's that's an incorrect presumption. And I can see where she got this from. Because the government seemed to be so vociferous in saying well see he learned this in Los Angeles. This is where he got it from. But we don't know that. Let's say you went on that. You still have to show that it's it's prejudicial error. Yes. And that goes to the the weight of the evidence. That goes to what the rest of the evidence was here. And if I'm not mistaken here this was what 16 people or something and we're down to the last two. Is that and so some of the first to deal first to square get the deal some of them came in against you and Mr. Hamilton right? That's correct. So we have people testifying and then he's in a room that's got $75,000 and else. So why don't you talk about the strength of the evidence? Well and what we say and I've spelled out more fully in our briefs. But what you've got here is a situation where yes there were wiretaps but no Mr. Royles never said anything about doing drug deals. Now maybe they're talking in coded language. Yes there were meetings between these people and they're never there surveillance of these. No drug deal is ever seen on those. So what you need to put this all together what the government needed was to have these other witnesses say this is what we're talking about on the wiretap. This is what we're talking about or what we did at these meetings. And the problem that the government had was the the character of these people. They just were not believable. You know surprisingly Mother Teresa doesn't deal drugs. So generally the type of people that are involved in a conspiracy all the time look pretty much like the people here. You're absolutely right about that judge. But the point is you either believe them or you don't believe them. The jury should get a chance to believe them or not believe them independently of having some evidence come in from some other thing that there's no nexus to this case. Would you like to achieve your aspirations? You're at 130. Yes I would. Okay. Thank you. Thank you. Good morning. Good morning. Your honors. May it please the court set that fall for Mr. Hamilton. I too am going to try to address two issues. The severance issue and the issue of the juror question related to coaching. I'm going to start with the first issue though based on whatever questions your honors have. I'll go back and forth between the issues. Would you like to save any though if that doesn't happen. That's late plans and all. With respect to the issue of coaching vouching. I came into this case about three or four weeks ago. So I've had the opportunity to review the entire record. But then the trial counsel basically set the judge up by saying oh we don't have anything further. And so the judge didn't do anything further. No because actually what happened was they came back into the courtroom and additional issues arose. And with respect to the government's allegation that it was being known right first. I could not find a case that addressed the precise set of issues that arose in this case. But the prosecutor was pretty smart here because the prosecutor obviously lost a little sleep after this. And then came back before the jury went out and said oh make sure to tell that juror that he or she can discuss in the jury room that they thought there was some coaching or what they think that they saw. So it's not as if and if people are you know there are observations. So it's not that the jury was to that what that person was beneficial to the defense. And that's why no one asked that person to be removed. Because that person saw faces being made or allegedly and that the prosecutor was trying to coach and winks and this that and the other which would tend to discredit the prosecution witnesses. So it when I look at the record having been a former trial lawyer and a former trial judge I'm thinking to myself yeah you you question it you look into it then no one wants you to do anything else and the prosecutor comes back and I thought that was a good suggestion. Let the juror talk to the other jurors about it if they think that that's how you evaluate credibility. So that takes a little you know and that would be a good defense witness. That may be but the problem that I see is that you have something that may have affected the integrity of the proceeding. Because you had a prosecutor that was nodding. It was clearly noticed by at least one juror. What was never explored was the extent to which number one other jurors may have noticed it and the extent to which the actual witness may have said yes I was being told what to do. And this isn't just potentially an issue of coaching. It's also potentially an issue of vouching. By nodding with the witness making statements you have the government essentially putting the prestige of its personal view behind what the witness is saying. But no one else saw it but this person. Well the family was behind and the court made it ascertain that they couldn't see what they said they were seeing. The court didn't see anything but but this person was still you know we don't know what the jurors discussed but other people could have said yeah I saw that same thing and I don't really like it but I still think that the defendant's guilty. But Your Honor touched on precisely what I believe is the primary issue. We don't know who else saw it because the court never conducted any kind of ordeer. The court never questioned any of the other witnesses to determine who may have seen something beyond that. But we're not you know but judges aren't you know lawyers aren't potted plants and judges don't like to interfere with it and when you do something and you ask the lawyers anything else you want me to do and they say no that's great. And I absolutely agree with you. Interfering with someone's case I mean you know the same is always hey judge if you're going to try my case don't lose it for me. So you have to be respectful of trial strategy. Without question and I absolutely agree with Your Honor with respect to that. However in this case what distinguishes this from most circumstances is the potential for it having had an impact on the integrity of the proceeding. Okay. When you're dealing with a situation like that it is incumbent upon the court to explore it in more detail to question the court. I think a parallel can be drawn to improper contact with a juror by a third party where if there's a if there's an issue of a substantial impropriety the presumption then becomes that there's something the government has to show that there is no harm and it's incumbent upon the court to inquire about that. I think the case that explores that is a recent decision from this court called Clark v. Chappelle and I think a parallel can be drawn to that in this instance. Now very briefly I'd like to also touch on the severance issue. Counsel. Yes. Before you go on if I could interject a question please on this last issue you're contention that the juror nodding or the juror who thought the prosecutor was coaching is a structural error so that prejudice doesn't have to be shown in light of other evidence. I don't believe it's a structural error in that sense. I think as I said the analogy to improper juror contact is apt. I think that once it's shown that there is something substantially improper which I believe was pretty clear in this case it then becomes a strong burden a heavy burden on the government to show that there is no harm from the error. Thank you counsel. Now briefly on the severance issue one point that I do want to raise because I don't think it was clear in the briefing is that originally with the 16 defendants there was proper joinder under Rule 8. However once all of these other defendants were removed and we were down to just Mr. Ruelas and Mr. Hamilton these two particular defendants had no commonality whatsoever in the series of transactions that they were involved in. And I think that bears out when you look at the fact that of the witnesses that testified seven of the witnesses only related to Mr. Ruelas had nothing to do with Mr. Hamilton. Five witnesses only related to Mr. Hamilton and had nothing to do with Mr. Ruelas. And of the remaining witnesses all of them were categorized where during the testimony there were clear indications by the State okay now we're going to talk about Mr. Ruelas. Okay now we're going to talk about Mr. Hamilton. They essentially conducted two separate trials during the course of the proceedings and that's a pretty clear indication that these should not have been tried together. And what's troubling about that is that you have a situation where Mr. Hamilton was accused only of selling marijuana or being involved in marijuana sales and Mr. Ruelas was accused of being involved in meth sales. And without question there is a very serious and substantial stigma associated with meth that does not exist with marijuana which has become so destigmatized nowadays that there's a massive movement across the entire country to legalize it. In fact at this time most many many states have legalized it. The states that haven't have decriminalized it or allowed medical marijuana. In fact right now our state of Arizona is the only state remaining that treats first time possession as a felony. So that stigma created a really serious problem for Mr. Hamilton such that at the time that the motion was renewed at the close of evidence the trial court would have been well served in allowing it to go forward to the jury for Mr. Ruelas but removing Mr. Hamilton for the case for a retrial. And I see I'm getting close to my two minute mark so. You want to save that? Yes. Thank you. All right we'll hear from the government. Good morning. Good morning your honors and may it please the court. I'm Krista Lanham on behalf of the United States. I actually want to start with the weight of the evidence in this case. A question that Judge Callahan you asked got to the weight of the evidence. This was a two-week trial during which four co-conspirators in this drug case who had previously pleaded guilty testified that they personally participated in drug transactions with these defendants. Their testimony was supported by extensive wiretap evidence, surveillance evidence, bank records, and various other pieces of evidence that really amounted to an overwhelming amount of evidence here. If the district court committed any error in the trial and on the errors that they've raised here we don't think that the district court did, it would have been harmless either cumulatively or considered singly just because of that huge weight of the evidence. I want to quickly address the sentencing issue that Mr. Ruelas raised since Judge Callahan also had a question about that. We agree that the remand here should be on an open record and our characterization in the answering brief was going to what we perceived as a suggestion that the remand should be limited on the purity issue or that the district court had somehow gotten the purity issue wrong. We believe that the district court got the purity issue right under the clear weight of authority. So you basically would agree that it would be really hard to do a remand and say you're stuck with this finding or if you're going to talk about the drugs, talk about the drugs and... Absolutely, Your Honor. And what we were doing essentially was responding to the defense characterization, recognizing that likely we might be in the same position again in terms of the purity question. If the district court does come back and decide that question again and the defense raises it, it could benefit the district court to have some guidance on that issue, but we agree that segmenting out certain parts of you can't look at this, you can't decide this is not the way to go in a remand. Do you think the district court needs on the purity? Well, we think that the district court did get it right, but obviously Mr. Ruelas thinks that the district court didn't get it right in terms of the methodology that the district court used in saying that there wasn't sufficient evidence of these other drug transactions and that these couldn't be used to determine purity. Well, but see, I guess what I was concerned about, let's say the district court goes back and hears some other things and then decides, I don't think I got this quite right the way that I did it before. If you go on an open record, the district court can do what the district court wants to do. If we make some kind of findings that could then become law of the case, even if the district court thought he or she was wrong on something, then you're really sort of, you know, it's very confusing to a district. It's very confusing to a lower court when you just go back, just do it. Your Honor, we are fine with go back and just do it. That is perfectly fine with us. And I understand where that could be more confusing. I also wanted to get to the juror question and the coaching. The standard, so even setting aside any question, there was no prosecutorial misconduct in this case. It wasn't raised as an issue of prosecutorial misconduct in the district court. We have a very strong invited error argument on this record before the district court. But even setting all of that aside, this court has consistently held, and the Supreme Court held in Getters, that it is not appropriate to reverse on this ground. This is not structural error, as counsel appropriately conceded. Cross-examination and argument are the primary ways of addressing this. And in this case, the cross-examination, the juror question arose in the middle of the cross-examination of this witness. So counsel had the ability, should he have wished to, to ask more questions about the witness prep or coaching or anything else as he went forward on cross-examination. And he had the ability, and in fact did, raise in closing argument the suggestion that the witness had been coached. Your Honor, you're exactly right that this is something that prejudiced the government, not the defense, as the government clearly stated at S.E.R. 924, in saying the government would like for the juror to be removed, and the defense wanted the juror to be kept on the jury. In fact, it appears he may have had a little bit of an outsized role because juror number 13 became the foreperson and was clearly able to share these views with the jury based on what happened with the rest of the jury, based on what happened at the trial court at the end of the trial. If there are no other questions on that, I can get to the 404B admission. The defendant in this case, in saying that he was not part of the conspiracy, meets the Ninth Circuit standard under Mayans for the government to have to prove up each and every element of the case, including intent and knowledge. So in saying, I didn't know what was happening on the calls, these were air conditioning phone calls, these were legitimately calls about air conditioning, he was contesting knowledge. Despite what he may be saying now, this was a knowledge question. And so the district court conducted a very careful 403 balancing analysis. She let in some parts, she didn't let in other parts. She did exactly what this court's case law instructed her to do in that matter. So we would ask on all grounds here that the convictions be affirmed and that just Mr. Verwillis's sentencing be remanded for resentencing. Was there any other further questions? I have no questions. Apparently there are no additional questions. Thank you. Since the government has really conceded the issue about sentencing, that doesn't need to be discussed. Good idea. Pardon me? Good idea. Don't snatch the feet from the jaws of victory. Exactly, I'll stay away from that. But the government's argument about this being an overwhelming case and so therefore any error was harmless, doesn't make sense when you see what happened here. And I would refer this court to the Vavages case, and I'm sure you're familiar with that, but that is one where the gentleman had a similar act. He was not convicted of that act, and this court talks about how harmful that kind of evidence is to the defendant. So yes, there was a lot of testimony about a lot of things that happened, but the only thing that connected that testimony up to Mr. Verwillis was the testimony of these clients, or I'm sorry, these co-defendants who are pointing the finger at him to save their own skin, and the people who are making these claims are really some detestable folks. The jury could find a lack of believability for those people, but this evidence cuts through that like a hot knife through butter. It says, look, this guy's done it before and he's doing it again. And so because of that, the error was extremely prejudicial to the defense, and for that reason, the case should be reversed and remanded for a new trial. Thank you. Thank you, Your Honors. Briefly on a couple of issues. First, again, with the weight of the evidence, I'll build on that. With respect to Mr. Hamilton, the evidence was fairly scant. It really came down to one witness, and that one witness was Juan Lamas, and with respect to Mr. Lamas, he was the precise witness that was on the stand when this alleged nodding occurred. I will note that Mr. Hamilton was deprived of the opportunity to explore this further going forward because the court specifically said that it did not believe that there needed to be any action going forward, that it knew that counsel was professional. The government attorney actually made statements with particular vowels and said it may have been nodding, but if any nodding was occurring, it was unconscious. Mr. Hamilton never got the opportunity to question the veracity of the government attorney's statements through cross-examination. So Mr. Hamilton was deprived of an opportunity to fully explore that. That actually gets worse when you consider the instructions given to the jury. The instructions given to the jury specifically noted what the jury could and could not consider as evidence. But did you object to those terrible instructions that were given to the jury? I don't believe there was an objection on the instructions, no. So someone didn't think they were that terrible, I guess. I'm not saying they were terrible. There were standard instructions given, but the problem that occurs with the instructions is when taken in context with the juror issue, because the juror was on the one hand told that he can talk about this particular issue with the rest of the jury. In fact, the judge held him back and explained that to him. However, on the other hand, they were told as far as what they could consider as evidence, they did not ever mention observations in the courtroom. They did not ever mention, and in fact, they specifically said, you cannot consider, quote, unquote, statements of the prosecutor. Well, if nodding during the course of somebody's testimony might be construed as agreement, we all know from the O'Brien test that, you know, nodding and gestures can be considered conduct for purposes of free speech. Certainly, they can be in this context as well, and they could be construed as agreement with what Mr. Lamas is saying. So the jurors may have been under the impression that they can't consider this when they're considering their evidence. I see my time has expired. Thank you. Thank you both for your argument. This matter will stand submitted. Just as we are Friday calendar, there were four cases on for tomorrow. 18-15771, 18-15774, 18-15948, 18-15936, which we submitted all of those on the We seem to have some students out there. Oh, what? Okay. All right. I would welcome what school you're from? From Lowell too? Oh, Lowell was here yesterday. All right. So we met with Lowell yesterday. I'm sorry the judges won't be able to meet with you today. We didn't, I didn't know that anyone was coming, and we have, we have other things that we have to do. But if, I would also indicate, I, we have, we have our, some of our law clerks here, if the staff attorney's office, while we're conferencing, if they want, if any of the law clerks want to join in. We obviously can't talk about the cases that are here today, and the lawyers wouldn't be able to do that. But if we, we're happy to see people coming to court, and we that you have the interest to do that, and watch, watch the third branch of government as it's doing its job, and, and the justice system. So thank you for joining us, and good luck. I know a lot of you are seniors, and you're all applying for college right now, so I hope you get your first choice. How's that? And some of us probably want you to go to Missouri. I think Judge Gould would have you go to, would it be Chicago? No. What's, what was your undergraduate? Penn. Penn. And I would have you go to Stanford. So, and I don't know who all the other lawyers would, but, but I'm sure wherever you decide, best of luck. All right. This court is in recess.
judges: Gould, Callahan, Bough